**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

| | | |
|---|---|---|
| **LAURA ANGIOLILLO** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **JOHN RIPPEL** | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | Case No.:  1:26-CV-00429-PTG-WEF |
| v. | ) | |
| | ) | |
| **HO-CHUNK INC., ALL NATIVE** | ) | JURY TRIAL DEMANDED |
| **GROUP, ALL NATIVE SHARED** | ) | |
| **SERVICES CO.,** | ) | |
| | ) | |
| *Defendants.* | ) | |
| _____ | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS**

Comes now Plaintiffs, Laura Angiolillo (hereinafter Plaintiff Angiolillo) and John Rippel (hereinafter "Plaintiff Rippel") collectively (hereinafter "Plaintiff"), by and through undersigned counsel, with her Opposition to Defendant's Motion to Dismiss, and states as follows:

**INTRODUCTION**

Defendant seeks to dismiss Plaintiffs' claims for three reasons.  As discussed herein, Defendant's arguments are without merit, and its Motion to Dismiss must be denied.  ***First***, it is not debatable that Defendant Ho-Chunk Inc. conducts business in the Commonwealth of Virginia, and in accordance with Virginia law, it ***must*** have a registered agent in the Commonwealth. Defendant Ho-Chunk does not have any other registered agent in the Commonwealth, and thus must accept service at its principal place of business in the Virginia.  A simple Google search establishes that Ho-Chunk, Inc. operates out of its corporate campus in Virginia.  Plaintiffs

1

properly served the registered agent of Ho-Chunk, Inc. at that address. Process of the Summons and Complaint was served on a person who self-identified as able to accept service of process on behalf of Ho-Chunk, Inc., thus Plaintiffs effected proper service on Ho-Chunk, Inc.

**_Second_**, in deciding that it wanted to benefit from federal funding programs, both with respect to Small Business Administration (hereinafter "SBA") contracting preference programs, and in accepting federal funds via the American Rescue Plan Act, the Defendants voluntarily waived sovereign immunity, and opted to make themselves subject to the laws of the United States. **_Third_**, Plaintiffs have sufficiently plead plausible claims of gender discrimination, disability discrimination and a hostile work environment to survive a motion to dismiss.

For these reasons, and those developed more fully herein, Defendant's Motion to Dismiss lacks merit and must be DENIED in its entirety.

## RELEVANT FACTS

Plaintiffs references and incorporates all allegations in the Complaint as if fully restated herein, and reject any and all facts asserted by Defendants that deviates from what is asserted in the Amended Complaint (hereinafter "Comp.").

## ARGUMENT

I.   PLAINTIFFS PROPERLY SERVED DEFENDANT HO-CHUNK INC.

Defendant argues that Plaintiffs failed to properly serve Defedant Ho-Chunk, Inc. The argument is absurd. Defendant Ho-Chunk, Inc. operates in the Commonwealth of Virginia. This is established by a simple Google search, and by the fact that Defendant Ho-Chunk, Inc. publicly advertises jobs in the Commonwealth of Virginia. *See* EXHIBIT 1. According to Virginia law, any business that transacts in the Commonwealth must have a registered agent and accept service of process in Virginia:

A. Each corporation shall continuously maintain in the Commonwealth:

1. A registered office that may be the same as any of its places of business; and

2. A registered agent, who shall be:

a. An individual who is a resident of the Commonwealth and (i) either an officer or director of the corporation or (ii) a member of the Virginia State Bar and whose business office is identical with the registered office; or

b. A domestic or foreign stock or nonstock corporation, limited liability company, or registered limited liability partnership authorized to transact business in the Commonwealth, the business office of which is identical with the registered office; provided such a registered agent (i) shall not be its own registered agent and (ii) shall designate by instrument in writing, acknowledged before a notary public, one or more natural persons at the office of the registered agent upon whom any process, notice or demand may be served and shall continuously maintain at least one such person at that office. Whenever any such person accepts service, a photographic copy of such instrument shall be attached to the return.

B. The sole duty of the registered agent is to forward to the corporation at its last known address any process, notice, or demand that is served on the registered agent.

Virginia Code § 13.1-634. As established in EXHIBIT 2, Plaintiff served Ho-Chunk, Inc. at its headquarters and principal place of business in the Commonwealth of Virginia. *See* EXHIBIT 2.

According to the process server, the person he delivered the summons and Amended Complaint to, accepted the documents and represented that she was authorized to do so as described in §13.1-634(A)(2)(b) to accept service on behalf of Defendant Ho-Chunk, Inc. *See* EXHIBIT 3.[1]

So, either Plaintiffs properly served Defendant Ho-Chunk, Inc. at its principal place of business in Virginia, or Defendant Ho-Chunk, Inc. is ***illegally operating*** within the Commonwealth of Virginia without a registered agent, for the express purpose of avoiding service of process. In any event, it is not debatable that Defendant Ho-Chunk, Inc. timely received the summons and Amended Complaint, and subjected itself to the jurisdiction of this Court by making an appearance. It can make no argument of surprise or prejudice.

---

[1] The other two Defendants were served at the office of the registered agent, which was a different address than the headquarters in Fairfax, VA. *See* EXHIBITS 3-4.

3

II.     DEFENDANT WAIVED SOVEREIGN IMMUNITY

A.      **The Application of Sovereign Immunity to Commercial Activity of Tribes Outside of their own Lands is Not Justified**

Defendants understandably rely on case law about the extension of sovereign immunity to commercial acts of tribal entities, but that precedent, while still binding, is far from settled.  In *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 819–20 (2014), the Supreme Court revisited the precedent set in *Kiowa Tribe of Oklahoma v. Mfg. Techs., Inc.*, 523 U.S. 751 (1998) that reinforced the idea that the sovereign immunity of native tribes extends to extra-territorial activity. The majority in *Bay Mills*, *supra*, decided to uphold that precedent, but it is the dissent that is more persuasive in the current business climate, and more aligned with what the current SCOTUS would likely reason.  In stating that they would reverse and abrogate *Kiowa*, the dissenting justices reasoned:

> Whatever the force of this assertion as a general matter [sovereign immunity], it is easy to reject as a basis for extending tribal immunity to off-reservation commercial activities. In *Kiowa* itself, this Court dismissed the self-sufficiency rationale as "inapposite to modern, wide-ranging tribal enterprises extending well beyond traditional tribal customs and activities." The Court expressed concern that "[i]n this economic context, immunity can harm those who are unaware that they are dealing with a tribe, who do not know of tribal immunity, or who have no choice in the matter, as in the case of tort victims."
>
> Nor is immunity for off-reservation commercial acts necessary to protect tribal self-governance. As the *Kiowa* majority conceded, "[i]n our interdependent and mobile society, ... tribal immunity extends beyond what is needed to safeguard tribal self-governance." *Ibid.* Such broad immunity far exceeds the modest scope of tribal sovereignty, which is limited only to "what is necessary to protect tribal self-government or to control internal relations." *Montana v. United States,* 450 U.S. 544, 564 (1981); see also *Nevada v. Hicks,* 533 U.S. 353, 392 (2001) (O'Connor, J., concurring in part and concurring in judgment) ("[T]ribes retain sovereign interests in activities that occur on land owned and controlled by the tribe ..."). And no party has suggested that immunity from the isolated suits that may arise out of

extraterritorial commercial dealings is somehow fundamental to protecting tribal government or regulating a tribe's internal affairs.

*Michigan v. Bay Mills Indian Comty.*, 572 U.S. at 819–20 (some internal citations omitted). The majority decision reasoned that the state of Michigan had not provided sufficient reason to reject the *stare decisis* of the *Kiowa* holding, and that Congress should take action if it seeks to remove immunity for acts of native tribes within the stream of commercial business outside of native lands. It is unlikely that the current panel of the Supreme Court would agree with that majority opinion. *See e.g.*, *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 388 (2023) (concluding that the Bankruptcy Code unequivocally abrogates the sovereign immunity of any and every government that possesses the power to assert such immunity.).

Nevertheless, Congress did precisely what the SCOTUS majority suggested when it enacted the laws and regulations that extended to native tribes preferential treatment in acquiring federal contracts. Congress very specifically ensured that the tribes would be held to the same rules as other commercial entities in the execution of federal contracts when it created the SBA program.

B.    **SBA 8(A) Businesses Waive Sovereign Immunity and Must Agree to be Subject to the Laws and Courts of the United States**

Defendants do not deny that they are wholly owned subsidiaries of a Native Tribe. Nor do they deny that they are regulated by SBA Section 8(a) regulations. *See* 13 C.F.R. §124.109(b). In order to participate in the 8(a) program, such entities must comply with the provisions of 13 C.F.R. §124.109(c)(1-7), which states in relevant part:

> ***Business eligibility.*** In order to be eligible to participate in the 8(a) BD program, a concern which is owned by an eligible Indian tribe (or wholly owned business entities of such tribe) must meet the conditions set forth in paragraphs (c)(1) through (c)(7).

(1) *Legal business entity organized for profit and susceptible to suit.* The applicant or participating concern must be a separate and distinct legal entity organized or chartered by the tribe, or Federal or state authorities. Where an applicant or participating concern is owned by a federally recognized tribe, the concern's articles of incorporation, partnership agreement, limited liability company articles of organization, or other similar incorporating documents for tribally incorporated <u>*applicants must contain express sovereign immunity waiver language, or a "sue and be sued" clause which designates United States Federal Courts to be among the courts of competent jurisdiction for all matters relating to SBA's programs including, but not limited to, 8(a) BD program participation, loans, and contract performance*</u>. Also, the concern must be organized for profit, and the tribe must possess economic development powers in the tribe's governing documents.

*See id.* (emphasis added).

The purpose of this provision is to ensure that businesses that obtain the contract bidding advantage of the SBA program do not gain an additional unfair competitive advantage by not being held to the same rules of the road as non-native businesses. In this case, Defendant admits that All Native Shared Services (hereinafter "ANSS") was the 8(a) entity gaining the advantage of preference in federal contracting, but that all of its assets are sheltered from judgment behind the legal fiction of All Native Group and Ho-Chunk, Inc.

Defendant then argues that while the regulations require 8(a) companies to sue and be sued under the laws of the United States, Defendant ANSS carved out for itself exceptions, while gaining to itself all of the advantages, and none of the responsibilities of being a federal contractor. Defendants clearly relinquished sovereign immunity as part of the SBA program. And whereas Plaintiff does not have access to the actual documents submitted by Defendants, the applicable regulation is clear. Relinquishment of sovereign immunity is part of the bargain to benefit from the program.

To get around that problem, Defendants point out that by self-serving fiat, they executed internal corporate documents reneging or limiting their own exposure to liability. Defendants

6

point to no authority that stands for the proposition that a company that offers the guarantees mandated by 13 C.F.R. §124.109(b) and (c) can simply undo those obligations with internal documents, while still benefiting from the federal contracts they have procured.  Notably absent from Defendants' factual recitation is any assertion that it informed the SBA of its unilateral narrowing or limiting language that Defendants now argue trumps both the language and intent of the "sue or be sued," provision in the C.F.R.

Defendants argue that Plaintiff's claims are not "related" to the programs run by ANSS. Plaintiff disagrees.   Plaintiff was directly involved in the procurement and execution of Defendant's federal contracts, as alleged in the Amended Complaint.  *See* Am. Comp. ¶¶ 29-30. Therefore, if she was retaliated against for raising concerns about how Defendant executed its business, such a claim could be construed as "relating" to the government contract.  But more importantly, the language in 13 C.F.R. §124.109(c) is expansive, stating that the agreement to be subject to the laws of the United States relates to " ***all matters* relating to the SBA programs, *including but not limited to*** 8(a) BD program participation, loans, and contract performance." This language clearly contemplates an expansive reading of the waiver of sovereign immunity. Defendant reads that language to be narrow and exclusive, which is clearly not what was intended.

**C.      Defendants Also Waived Sovereign Immunity When They Accepted Federal Recovery Act Funds**

In addition to waiving sovereign immunity in order to win federal contracts, Defendants waived sovereign immunity to receive American Recovery Plan Act (hereinafter "ARPA") funds in 2021.  *See* EXHIBIT 4.  Entities receiving funds under ARPA were required to comply with federal civil rights laws prohibiting discrimination.  While ARPA itself set the funding levels, compliance with ARPA was enforced through the Assurances of Compliance with Civil Rights tied to Sections 602(b) and 603(b) of the Social Security Act, as added by Section 9901 of ARPA.

These provisions require adherence to Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act, and the Age Discrimination Act, prohibiting discrimination based on race, color, national origin, age, and disability. It is that specific provision that provides funds to native tribes in 9901(b)(2)(C). The applicable provision prohibits discrimination on the basis of race, color, or national origin in any program or activity receiving federal financial assistance. It ensures that public funds are not used to subsidize or encourage discrimination, allowing for fund termination or legal action if compliance is not met. Thus, Congress specifically conditioned funds on non-discrimination and certification thereof.

Defendants rely on the fact that the Department of the Treasury opted not to enforce this provision of the Congressional act. But the Department of the Treasury did not have the authority to abrogate a clear provision and condition of the funds distributed by Congress. Recent Supreme Court precedent has made crystal clear that it is ***only acts of Congress*** that can contract the sovereign immunity of the tribes, and Congress opted to do so as a condition of receipt of ARPA funds from the American taxpayers. And unlike other statutes, in which Congress made specific exceptions for the tribes, ARPA has no such exception.

Because Congress did, in fact, apply a condition to receipt of ARPA funds that subjects the tribes to civil rights laws, compliance guidelines, such as relied upon by Defendants, cannot undo the same. There is no reading of the holding in *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. at 388, that supports the notion that an executive administration has the authority to undermine such an act of Congress.

Once again, Defendants want all of the benefits of being engaged in federal commerce, as well as the largess of the taxpaying public through acts of Congress to specifically benefit them, while bearing none of the responsibilities, or living by any of the other rules that constrain their

8

competitors.  Whereas a stronger argument can be made with respect the business dealings of the tribes within their own territories, where such tribes ask for and receive benefits and advantages from the greater community, most especially financial benefits, the arguments that the tribe should be remain immune from bearing responsibility for the harm it causes through such actions falls flat.

III.     PLAINTIFFS ASSERT VALID AND SUFFICIENTLY PLEAD CLAIMS

A.       **In Count I Plaintiff Angiolillo Asserts A Justiciable Failure to Accommodate**

To state a claim for failure to accommodate, a plaintiff must plausibly allege "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." *See Kelly v. Town of Abingdon*, 437 F. Supp. 3d 517, 527 (W.D. Va. 2020), *aff'd sub nom. Kelly v. Town of Abingdon, Virginia*, 90 F.4th 158 (4th Cir. 2024) (citing *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (internal quotation marks, alterations, and citations omitted).

Plaintiff Angiolillo's failure to accommodate claim meets these criteria.  She alleges that she has a disability (*see* Comp. ¶¶ 27-33); she states that she placed her employer on notice of the disability (*see* Comp. 35); she asserts that the accommodation she requested would allow her to work in peace and focus to complete tasks (*see* Comp. ¶¶ 33-34); and she asserts that the employer refused the accommodation and mocked her for needing it (*see* Comp. ¶¶ 36-39).  Plaintiff Angiolillo specifically explains the major life activities affected by her disability (see Comp. ¶¶ 28-33) and explained how the accommodation she requested would help her to stay focused and on task (*see* Comp. ¶ 35).  That is sufficient to state a plausible claim.

Defendant argues that Plaintiff Angiolillo simply "preferred" to receive task in a way that allowed her to focus and did not exacerbate her symptoms. That is an ignorant judgment that is not grounded in any of the actual science around ADHD. As explained in EXHIBIT 5, the principle way to accommodate ADHD in the workplace is through reduction of distractions. That is precisely what the Plaintiff Angiolillo asked for, and rather than being accommodated, she was ridiculed and attacked. *See* Comp. ¶¶ 35-39. Defendant's argument that Plaintiff does not identify the tasks she could not complete without an accommodation misses the mark. ADHD does not prevent a person from being to complete any specific task. It causes them to be overwhelmed when trying to juggle multiple tasks at one time, and to lose focus about what should be prioritized. *See* EXHIBIT 5. Plaintiff clearly asserts that her ADHD was being exacerbated by being constantly interrupted in person when she could have been tasked in ways that did not cause her to lose focus. This is sufficient to establish a claim above the speculative level. *See Taylor v. Revature LLC*, No. 1:22-CV-1153 (RDA/WBP), 2025 WL 711961, at *6 (E.D. Va. Mar. 5, 2025). ("Although a plaintiff "does not have to provide extensive detail as to [her] medical condition," she must "plead a disability claim 'above a speculative level.' ") (citing *Hice v. Mazzella Lifting Technologies, Inc.*, 589 F. Supp. 3d 539, 547 (E.D. Va. 2022)).

Plaintiff pleads sufficient facts to establish her ADA reasonable accommodation claim, but if the Court concludes that she did not, dismissal should be without prejudice, and Plaintiff should be given leave to amend to add the factual detail about Defendant's refusal to accommodate her, and how engagement in an interactive process would have helped her.

**B.** **Plaintiff Angiolillo's Retaliatory Hostile Work Environment Claim in Count II is Sufficient to Survive the Motion to Dismiss**

To establish retaliation under the ADA, Plaintiff Angiolillo must demonstrate that "(1) that she has engaged in conduct protected by the ADA; (2) that she suffered an adverse action

10

subsequent to engaging in protected conduct; and (3) that there was a causal link between the protected activity and the adverse action." *See generally Evans v. Larchmont Baptist Church Infant Care Ctr., Inc.*, 956 F. Supp. 2d 695, 704 (E.D. Va. 2013). *Freilich v. Upper Chesapeake Health, Inc.,* 313 F.3d 205, 216 (4th Cir. 2002) (citation omitted). Courts have recognized that the creation of a hostile work environment can be a form of retaliatory adverse action. *See Sunkins v. Hampton Roads Connector Partners*, 701 F. Supp. 3d 342, 359–60 (E.D. Va. 2023) ("[c]reation of a hostile work environment serves as the adverse action component of the retaliation claim.") (citing *Von Gunten v. Maryland*, 243 F.3d 858, 869-70 (4th Cir. 2001). A retaliatory hostile work environment claim "requires establishing the same facts as a retaliation claim, save that the 'materially adverse' element is replaced by 'subjected to severe or pervasive retaliatory harassment by a supervisor.' ")

Plaintiff Angiolillo engaged in protected activity when she sought a reasonable accommodation of her disability. *See Kelley v. Mayorkas*, 694 F. Supp. 3d 715, 730 (E.D. Va. 2023) ("A request for reasonable accommodation is a protected activity.") (citing *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 706 (4th Cir. 2001)). In response to that request, and contrary to Defendant's argument, Plaintiff Angiolillo was humiliated by her managers, repeatedly, because of her need for accommodation. *See* Comp. ¶¶ 38-40. As alleged in the Complaint, she was demeaned in front of her colleagues, which got to be so severe and pervasive that she raised the issue internally with HR. *See* Comp. ¶ 41. Again, this alleges frequent and severe harassment, not just occasional disagreements. But the fact that her managers were attacking her because of her disability and in reference to how her disability affected her (i.e. causing her to be slower to respond, requiring notes, needing beaks and isolation), clearly alleges the causal connection that Defendants claim is absent.

Plaintiff Angiolillo alleges that her manager screamed at her because she needed an accommodation, and actually referenced the term accommodation what he believed was a "made up" condition when he berated her. *See* Comp. ¶ 38. That is a clear indication of animus towards someone because of their disability, and certainly, a trier of fact could reasonably reach that conclusion. Moreover, Plaintiff specifically pleads that she went to HR to inform them of the harassment and bullying she was enduring that was so severe it was materially affecting her ability to execute her duties. *See* Comp. ¶¶ 41-42. HR opted to do nothing about it. That is sufficient to impute liability to the enterprise because it was placed on notice that the employee was being discriminated against. *See Emami v. Bolden*, 241 F. Supp. 3d 673, 684 (E.D. Va. 2017) (finding that email to HR placed employer on notice of discrimination). Defendant is incorrect in stating that the "conduct stopped" in November of 2024. Nowhere in the Complaint does it state that the conduct stopped at that time. Defendant simply asserts that, without an reference to such an allegation in the Complaint. To the contrary, Plaintiff alleges that retaliatory conduct against her escalated. *See* Comp. ¶¶ 43-54.

Plaintiff Angiolillo has plead sufficient facts to support a plausible claim of hostile work environment. To the extent that the claim is insufficiently detailed, Plaintiff Angiolillo should be given leave to amend to add details to meet the pleading standard.

C.    **In Count III Plaintiff Angiolillo Pleads Sufficient Facts to Support a Claim for Retaliatory Discharge**

Plaintiff Angiolillo's prima facie case entails proof of the following elements: (1) that she "engaged in a protected activity"; (2) that "the employer took a materially adverse action against" the plaintiff; and (3) that there is a causal link "between the protected activity and the adverse action." *See Emami v. Bolden*, 241 F. Supp. 3d at 680. Plaintiff Angiolillo meets her pleading requirement by alleging that she engaged in protected activity:

1) When she requested a reasonable accommodation. *See* Comp. ¶ 35

2) On October 31, 2024, when she reported Mr. Covington's harassment and regarding her disability to HR. *See* Comp. ¶ 41.

Plaintiff Angiolillo was terminated, which is clearly and adverse action. With respect to Count III, Plaintiff Angiolillo does not rely on temporal proximity to establish causation, but rather asserts that the post-protected activity hostile work environment she was subjected to establishes the employer's animus and motive for terminating her employment. *See King v. Pulaski Cnty. Sch. Bd.*, 195 F. Supp. 3d 873, 885 (W.D. Va. 2016) ("Even if temporal proximity is missing, "courts may look to the intervening period for other evidence of retaliatory animus" which "may be used to establish causation."") (quoting *Lettieri v. Equant Inc*., 478 F.3d 640, 650 (4th Cir. 2007)).

Other factors to show causation include inconsistent reasons by the employer for the adverse action and differential treatment of other employees. *Linkous v. CraftMaster Mfg., Inc*., No. 7:1 0–CV–00107, 2012 WL 2905598, at \*8 (W.D. Va. July 16, 2012). In other words, Defendant's repeated and consistent demeaning and denigrating comments to Plaintiff about needing a reasonable accommodation establish the causal connection between her protected activity and her termination. See *Mohammed v. Cent. Driving Mini Storage, Inc.*, 128 F. Supp. 3d 932, 945–46 (E.D. Va. 2015) (citing *Bush v. Donahoe,* 964 F.Supp.2d 401, 426 (W.D.Penn.2013) (unable to show temporal proximity, "[p]laintiff must point to evidence of a pattern of antagonism or retaliatory motive during the intervening period, or show inconsistent reasons given by [d]efendant for the adverse employment actions").

### D. **Plaintiff Angiolillo Plausibly Alleges Retaliation for Protected Title VII Disclosures**

Counts IV and V both allege that Plaintiff Angiolillo was retaliated against for making protected disclosures. Count IV relates to protected disclosures about disparate pay based on gender, and Count V relates to reporting gender based harassment. Plaintiff Angiolillo carries her burden by establishing that she reported the gender-based pay disparity in November of 2024. As soon as she did so, her work conditions deteriorated. Thereafter, on January 16, 2025, Plaintiff engaged in protected activity again, by reporting screaming and intimidating behavior by a male employee against a female employee, that was so shocking that Plaintiff Angiolillo believed it was a security threat. *See* Comp. ¶¶46-48. Withing a 24 hours of this second protected activity, Plaintiff was retaliated against by being removed from the workplace, *see* Comp. ¶¶ 50-51, and then was summarily terminated the next day. *See* Comp. ¶ 53.

The five days (two of which were the weekend) between Plaintiff Angiolillo's protected activity and her termination clearly meets the standard of "very close" temporal proximity that established causation. *See Hinton v. Virginia Union Univ.,* 185 F. Supp. 3d 807, 837 (E.D. Va. 2016) ("When pleading a sufficient case, either the retaliation must closely follow the protected activity or the plaintiff must put forth a sufficient explanation for the time elapsed between the protected activity and the alleged retaliation."). *See also Wilcox v. Lyons*, No. 7:17-CV-000530, 2018 WL 1955826, at *2 (W.D. Va. Apr. 25, 2018), aff'd, 970 F.3d 452 (4th Cir. 2020) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima, facie case uniformly hold that the temporal proximity must be 'very close[.]'").

It is not debatable that Plaintiff Angiolillo suffered an adverse action when she was terminated from her employment, and therefore she has alleged sufficient facts to support claim of

retaliation.  For these reasons, and those discussed herein, Plaintiff Angiolillo has met her pleading burden.  But to the extent she has not, the proper action would be to dismiss without prejudice and with leave to amend the Complaint.  *Huber v. TIAA*, No. 5:24-CV-00041, 2024 WL 4795680, at *9 (W.D. Va. Nov. 14, 2024) ("[t]he court concludes that without-prejudice dismissal is appropriate because [plaintiff] might be able to correct the deficiencies in those claims by pleading additional facts.")

## II.    PLAINTIFF RIPPEL'S CLAIM SHOULD NOT BE DISMISSED

Plaintiff Rippel asserts a justiciable claim of discriminatory disparate treatment based on sexual orientation.  Specifically, Plaintiff Rippel asserts: 1) that he is a member of a protected class (see Comp. ¶ 61); 2) satisfactory job performance (see Comp. ¶¶ 58-59, 77-78); 3) an adverse employment action (see Comp. ¶¶ 64, 73, 78, 81, 83); and different treatment from similarly situated employees outside the protected class (*see* Comp. ¶¶ 67-72).  *See Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010); *Jones v. Virginia Polytechnic Inst. & State Univ.*, No. 7:17-CV-531, 2018 WL 4604563, at *5 (W.D. Va. Sept. 25, 2018).  Plaintiff must also plausibly allege discriminatory intent.  *See Barnett v. Tech. Int'l, Inc.*, 1 F. Supp. 2d 572, 576 (E.D. Va. 1998) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977)).

Plaintiff Rippel meets his pleading burden by establishing all of the elements of the claim, which includes identifying a similarly situated comparator employee, Ms. Sparks, and alleging facts that lead to an inference of discriminatory animus.  *See* Comp. ¶¶ 67-70.  At this stage of the case, that is sufficient to establish a plausible claim.  Contrary to Defendant's argument, Plaintiff Rippel is not asserting a constructive discharge.  He is, however, alleging that the "restructuring" that he was subjected to, resulted in an obvious demotion, and that Defendants took away almost his entire portfolio of responsibilities, leaving him with essentially nothing to do.  *See United States*

15

*ex rel. Bachert v. Triple Canopy, Inc.*, 321 F. Supp. 3d 613, 622 (E.D. Va. 2018) ("Importantly, "[d]emotion can constitute a constructive discharge, especially where the demotion is essentially a career-ending action or a harbinger of dismissal.") (citing *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994). Plaintiff Rippel specifically alleges that he was not only reduced to only one portfolio (see Comp. ¶ 80), but that he was excluded from any opportunity to get any new portfolio. *See* Comp. ¶ 81. In this context, that is sufficient to allege an adverse action. Defendants' arguments to the contrary are unavailing.

Plaintiff specifically alleges that he suffered a major reduction in responsibilities after the restructuring. *See* Comp. ¶¶ 78-80. In fact, Plaintiff was left with essentially no responsibilities, and certainly nothing to do once the one portfolio he had left was completed. That is enough at the pleadings stage to state a justiciable claim. In context, factoring in the comments and behavior of Mr. Rist, the actions against Plaintiff Rippel could plausibly amount to discrimination based on his widely-known sexual orientation, and as such, the claim is sufficient to survive the motion to dismiss. To the extent that it is insufficient, Plaintiff Rippel must be given the opportunity to amend to add additional facts, if the Court deems that necessary.

## CONCLUSION

For the reasons set out herein, Plaintiffs' claims are sound and justiciable. Defendants have repeatedly taken affirmative steps to become part of the flow of regular commerce, and have waived sovereign immunity to do so. Their Motion to Dismiss is without merit and should be DENIED with respect to all claims herein.

Respectfully submitted,

/s/*Thomas Curcio*
Thomas J. Curcio

16

CURCIO LAW
700 North Fairfax Street, Suite 505
Alexandria, Virginia 22314
Telephone: (703) 836-3366
Facsimile: (703) 836-3360
Email: tcurcio@curciolaw.com

Pamela M. Keith (pro hac vice)
Raymond K. Gordineer (pro hac vice)
CENTER FOR EMPLOYMENT JUSTICE
650 Massachusetts Avenue, NW, Suite 600
Washington, D.C. 20001
Telephone: (202) 800-0292
Facsimile: (202) 807-5725
pamkeith@centerforemploymentjustice.com
raygordineer@centerforemploymentjustice.com

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 11th day of May 2026, a true copy of the foregoing Memorandum of Law in Opposition to Defendants' Motion to Dismiss was filed electronically through the Court's ECF system, on:

Ashley D. Jones
LITTLER MENDELSON, P.C.
1800 Tysons Boulevard
Suite 500
Tysons Corner, VA 22102
Telephone: (703) 442-8425
Facsimile: (703) 852-7169
adjones@littler.com

Alison N. Davis
815 Connecticut Ave. NW
Suite 400
Washington, DC 20006
Telephone: (202) 842-3400
Facsimile: (202) 842-0011
andavis@littler.com
*Counsel for Defendants*

17

/s/*Thomas Curcio*
Thomas Curcio